IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HAROLD GAGE, JR.                          §
                                          §
Plaintiff,                                §
                                          §
V.                                        §    CIVIL ACTION NO. H-11-02363
                                          §
MICHAEL J. ASTRUE,                        §
COMMISSIONER OF THE SOCIAL                §
SECURITY ADMINISTRATION,                  §
                                          §
Defendant.                                §

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Doc. No. 12), and Defendant's cross Motion for Summary Judgment (Doc. No. 10). Having considered the cross motions for summary judgment, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

## I.    Introduction

Plaintiff Harold Gage ("Gage") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his

---

[1] On May 17, 2012, pursuant to the parties consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. (Doc. No. 19).

application for disability insurance benefits.  Gage argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision that he was not disabled because he "had the residual functional capacity to perform light work" and "was capable of performing past relevant work as a valve operator."  (Tr. 24, 29, 30).  Gage also argues that new evidence should be considered by the court which proves that he was disabled, and that his blood pressure was also a contributing, disabling impairment.  (Doc. No. 12).  The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's findings that Gage was not disabled as a result of his impairments, the decision comports with applicable law, and that it should therefore be affirmed.  (Doc. No. 11).  The Commissioner also argues that new evidence should not be considered as it is not material and does not relate to the relevant time period. (Doc. No. 13).   Furthermore, the Commissioner argues that the ALJ was not obligated to consider Gage's hypertension as Gage never alleged it as a disabling condition prior to this appeal.  (Doc. No. 13).

## II.    Administrative Proceedings

On May 13, 2009, Gage applied for Social Security Disability Insurance benefits, claiming that he has been unable to work since January 1, 2006 due to "back problems, back spasms, [a] leg problem, and [back] surgery."  (Tr. 69, 118).  The Social Security Administration ("SSA") denied his application at the initial and reconsideration stages.  (Tr. 65, 74).  After receiving the denials, Gage requested a hearing before an ALJ.  (Tr. 78).  The SSA granted his request and the ALJ held a hearing on February 9, 2010, at which Gage's claims were considered *de novo*.  (Tr. 35).  Gage thereafter amended his alleged onset date to August 1, 2009.  (Tr. 429). On April 14, 2010, the ALJ issued his opinion finding Gage not disabled.  (Tr. 21).  At step one,

the ALJ found that Gage had not engaged in substantial gainful activity since the amended alleged disability onset date of August 1, 2009, through December 31, 2009, the date Gage was last insured. (Tr. 23). At step two, the ALJ found that Gage's severe impairments were "degenerative disc disease and status post lumbar laminectomy." (Tr. 23). At step three, the ALJ found that Gage "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 23). Before considering step four, the ALJ concluded that Gage had the residual functional capacity ("RFC") to perform light work as Gage "was able to lift and carry [twenty] pounds occasionally and [ten] pounds frequently, stand and walk about [six] hours in an [eight] hour day, and sit for at least [six] hours in an [eight] hour day." (Tr. 24). At step four, relying on vocational expert testimony, the ALJ found that Gage was not disabled as he "was capable of performing past relevant work as a valve operator." (Tr. 29).

Gage then requested the Appeals Council to review the ALJ's adverse decision. (Tr. 15). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. §§ 404.970, 416.1470. On April 18, 2011, after considering Gage's contentions, in light of the applicable regulations and evidence, the Appeals Council concluded that there was no basis upon which to grant Gage's request for review. (Tr. 1). The ALJ's decision thus became the final decision of the Commissioner. (Tr. 1). Gage timely filed his appeal of the ALJ's decision. (Doc. No. 1). Both Gage and the Commissioner have filed Motions for Summary

3

Judgment. (Doc. Nos. 10, 12). This appeal is now ripe for ruling.

## III. Standard for Review of Agency Decision

The Court's review of a denial of disability benefits "is limited to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when it is not supported by substantial evidence. *Id*. While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). "[C]onflicts in the evidence are for the [Commissioner] to resolve." *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.*

*N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson,* 864 F.2d at 344.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through "medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony,* 954 F.2d at 293 (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

5

The Commissioner applies a five-step sequential process to decide disability status:

> (1) If the claimant is presently working, a finding of "not disabled" must be made; (2) if the claimant does not have a "severe impairment" or combination of impairments, she will not be found disabled; (3) if the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded; (4) if the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and (5) if the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience and residual functional capacity, she will be found disabled.

*Anthony,* 954 F.2d at 293 (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Leggett v. Chater,* 67 F.3d 558, 563 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

In this case, the ALJ found that Gage, despite his severe impairments, could perform light work and was capable of performing his past relevant work as a valve operator. (Tr. 24, 29). This Court must determine whether substantial evidence supports the ALJ's RFC finding that Gage was capable of performing past relevant work as a valve operator.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability

as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V.   Discussion

### A.   New Evidence

Gage submitted new evidence to the Court to consider.  A district court's review of social security appeals is "wholly appellate.  The courts may not take new evidence, and may only remand for that purpose under the discretionary standard established by law." *Ellis v. Bowen,* 820 F.2d 682, 684 (5th Cir. 1987).  The Court may order the Commissioner by remand to consider new evidence "only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).  "In order to justify a remand, the evidence must first be 'new', and not merely cumulative of what is already in the record.  Second, it must be 'material'; it must be relevant, probative, and likely to have changed the outcome of the [Commissioner's] determination." *Pierre v. Sullivan,* 884 F.2d 799, 803 (5th Cir. 1989).  "Furthermore, '[i]mplict in the materiality requirement . . . 'is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.'" *Johnson v. Heckler,* 767 F.2d 180, 183 (5th Cir. 1985) (quoting *Szubak v. Sec'y of Health & Human Servs.,* 754 F.2d 831,833 (3d Cir. 1984)).  Finally, the claimant must show good cause for not previously incorporating the evidence into the administrative record. *Pierre,* 884 F.2d at 803.

Gage submitted a medical record from Texas Orthopedic and Sports Medicine Center dated September 6, 2011 that indicated his previous back condition had deteriorated.  (Doc. No.

6).  Gage also submitted a letter from Camille J. George, M.D. dated January 26, 2012.  (Doc. No. 9).  Within the letter, Dr. George referenced a "recent physical examination" and a "recent functional capacity evaluation," and indicated deterioration in Gage's condition.  The relevant time period for purposes of Gage's application for disability benefits is from August 1, 2009, the alleged disability onset date, to December 31, 2009, the date Gage was last insured.  There is nothing in these records that indicate Gage's condition prior to the date he was last insured. These records show subsequent deterioration in Gage's previously non-disabled condition well after December 31, 2009.  Therefore, these two records are not material.

Gage has also requested the Court to consider a Physical RFC Questionnaire dated April 29, 2010 from Bruce L. Ehni, Chief of Neurosurgical Service of the Michael E. DeBakey Veterans Affairs Medical Center.  (Doc. No. 12).  Dr. Ehni indicated that the earliest date the symptoms and limitations listed in the Physical RFC Questionnaire applied was December 27, 2009.  Although this is only four days before the date last insured, the Physical RFC Questionnaire does, marginally, relate to the relevant time period.  However, this Physical RFC Questionnaire could have been submitted to the SSA, and therefore cannot be considered "new." The Appeals Council denied Gage's request for review on April 18, 2011.  Dr. Ehni's Physical RFC Questionnaire was dated April 29, 2010.  Gage had close to a year to submit Dr. Ehni's Physical RFC Questionnaire to the Appeals Council for consideration and failed to do so. Furthermore, Gage has failed to show good cause for not having incorporated this evidence into the record at the administrative level.

Gage also submitted a medical record from Dr. George dated November 4, 2004 to the Court to be considered as new evidence.  (Doc. No. 12).  This record indicated that Gage was

"[s]tatus post L5/S1 herniated disc." (Doc. No. 12).  Dr. George also recommended treatment with a Medrol dose pack, physical therapy with modalities, and injections that Gage refused. (Doc. No. 12).  This record from Dr. George is not new as it was dated November 4, 2004.  In addition, this medical record is not material as it does not indicate a disabling impairment.  There is not a reasonable possibility that this medical record would have changed the Commissioner's decision.  Furthermore, Gage has not shown good cause for failing to incorporate this evidence into the record at the administrative level.

Gage has also asked the Court to consider a Mayo Clinic statistic that he says states that "90% of patience [sic] with nerve damage from back surgery have permanent damage." (Doc. No. 9).  Gage does not provide support for this statistic and does not indicate how this would have changed the Commissioner's decision.  The Commissioner found Gage's degenerative disc disease and post lumbar laminectomy to be severe impairments.  This additional Mayo Clinic statistic, if accurate, would not reasonably have changed the Commissioner's decision.  Again, Gage has not shown good cause for failing to incorporate this evidence into the record at the administrative level.  In conclusion, the new evidence presented by Gage does not warrant a remand for consideration by the Commissioner.

In addition to the new evidence requests, Gage asks the court to take into consideration his blood pressure as an additional cause of his inability to work.  (Doc. No. 12).  "The ALJ's duty to investigate . . . does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett*, 67 F.3d at 566.  This is the first time Gage alleges hypertension as a contributing factor to his disabling condition.  This issue was not raised before the ALJ.  Therefore, the ALJ was not under an obligation to

consider hypertension as a debilitating factor.  Furthermore, Gage's history of hypertension is documented within the record.  There is no evidence within the record that Gage's hypertension imposed any additional limitations upon him during the period under review.

**B.      Objective Medical Evidence**

The objective medical evidence shows that Gage had complained of, and was treated for, symptoms resulting from his degenerative disc disease and post lumbar laminectomy.  On July 12, 2004, Dr. George examined Gage and noted a "L5/S1 disc protrusion and right S1 radiculopathy" and determined to perform an "endoscopic right L5/S1 microdisckectomy." (Tr. 329).  Later that day, Gage underwent a right-sided lumbar hemilaminectomy.  (Tr. 323).  The surgery, performed by Dr. George, included a microdiskectomy of the right L5-S1 disk herniation which was endoscopically performed with fluoroscopy, right foraminotomy at L5-S1, exploration of the spinal canal and nerve roots, neurolysis of the right S1 nerve root, and a fat graft to the right S1 nerve root.  (Tr. 323).  On February 10, 2005, Dr. George examined Gage and noted that he had normal sensation in the bilateral feet.  (Tr. 203).  Dr. George also noted that Gage moved "his toes easily and capillary refill [was] less than two seconds." (Tr. 203).  Dr. George further noted that Gage "demonstrate[d] improvement of his strength in the right gastrocnemius muscle" and that "[t]he incision in the lower lumbar area [was] well healed and non[-]tender."  (Tr. 203).  Dr. George's impression was that Gage was "[s]tatus post L5/S1 herniated disc."  (Tr. 203).  On April 28, 2005, Dr. George examined Gage and noted that his "deep tendon reflexes [were] uniformly symmetrical in the lower extremities," that there was "mild residual weakness of flexion of the toes in the right foot" and there was "[s]pasm . . . in the right paraspinal muscles."  (Tr. 200).

10

On January 30, 2006, Roham Darvishi, M.D., examined Gage and noted that he had hypertension that was not controlled. (Tr. 260). Therefore, Dr. Darvishi proscribed 12.5 mg of HCTZ to Gage to control the hypertension. (Tr. 260). Dr. Darvishi also noted that Gage had dyslipidemia and gastroesophoageal reflux disease, and that the reflux disease was stable with medication. (Tr. 260).

On June 14, 2006, an X-ray of Gage's spine showed "[m]ild degenerative bony changes of the lower lumbar spine." (Tr. 206). The X-ray did not show evidence of "acute fracture, dislocation, or malignant bony destruction." (Tr. 206). On July 20, 2006, Dr. George examined Gage and noted that there was "improvement of the previous trigger points in the right paraspinal muscles." (Tr. 188). Dr. George also noted that Gage was "post L5/S1 herniated disc resection and trigger points." (Tr. 188).

On June 3, 2008, Jeffrey Citara, M.D., examined Gage and noted he had hypertension. (Tr. 231). During the examination, Dr. Citara found that Gage had a full range of motion, his sensation was intact to light touch throughout and that his reflexes were 2+ throughout. (Tr. 231). Dr. Citara also noted Gage's lumbo-sacral X-ray performed on June 14, 2006 showed mild multilevel degenerative disc disease. (Tr. 231). Dr. Citara's impression was that Gage had chronic axial and radicular low back pain. (Tr. 231).

On June 15, 2008, an MRI of Gage's spine showed that his "lumbar spine alignment [was] normal." (Tr. 205). The MRI also showed that "[t]he bone marrow signal [was] unremarkable and there [was] no bony lesion." (Tr. 205). The MRI scan of Gage's spine at L5-S1 showed "a central/paracentral disc extrusion more prominent in the left measuring 1.2 cm superior-inferior X 0.7 cm anterior-posterior that likely compressed the descending left S1 nerve

root." (Tr. 206-07).

On July 10, 2009, Daryl Daniel, M.D., conducted a consultative examination of Gage. (Tr. 268). During the examination, Dr. Daniel noted that there was "[n]o evidence of pathological curvatures, spasm or misalignment" in his back. (Tr. 269). Dr. Daniel also noted:

> **Musculoskeletal**: Gait and station [were] slow and abnormal as noted difficulty with heel and toe examination. [Gage had] [s]ome difficulty getting on or off the table, getting up from a sitting position and getting around the room. Finger control is normal. No evidence of atrophy in the major muscle groups.
>
> **Neurologic**: Cranial nerves II through XII, deep tendon reflexes, sensory examination and range of motion [were] all essentially within limits. Bilateral straight leg raises were positive at [forty] degrees bilaterally and abnormal. [Gage was] able to effectively walk on tiptoes and heels, but not able to bend over to touch toes.

(Tr. 269). Based on the examination, Dr. Daniel's clinical impression was that Gage had "[c]hronic low back pain with probable arthritis secondary to [his] previous surgery," and that he had lumbago (pain in the lumbar region). (Tr. 269).

On October 26, 2009, an MRI performed on Gage's lumbar spine revealed the following:

> At L5-S1, there [was] posterior disc protrusion asymmetric to right side causing mild indentation over the anterior aspect of thecal sac and encroaching right S1 nerve root in right lateral recess. The disc protrusion measure[d] [five] mm in anteroposterior dimension and [twelve] mm in transverse dimension. There [was] mild to moderate narrowing of right neural foramen. The left neural foramen [was] patent. Ligamentum flavum hypertrophy [was] seen. No spinal canal stenosis [was] seen. Pre and paravertebral soft tissues [were] unremarkable.

(Tr. 296). The MRI also showed that the "alignment of the lumbar spine [was] maintained" and that "[s]ubchondral bony degenerative [were] seen at L5/S1 level." (Tr. 395).

On October 28, 2009, Dr. George examined Gage and noted the following:

> On physical examination, the lower back demonstrate[d] mild tenderness and spasm at the L2 and L3 levels. His previous incision [was] well healed and non[-

12

]tender.   He continue[d] to demonstrate some weakness in flexion of the interphalangeal joints of the right foot.  This weakness involve[d] predominately the left her [sic] toes.  He [did] have good range of motion of the lumbosacral spine.   Deep tendon reflexes remain[ed] uniformly symmetrical in the lower extremities.   Motor function [was] 5/5.   Impression: Status post right L5/S1 microdiskectomy with lumbosacral pain.

(Tr. 392).

On November 6, 2009, Gage underwent an electro-diagnostic exam consisting of nerve conduction studies and needle electromyography.  The peroneal motor, tibial motor, superficial peroneal sensory and sural sensory studies were performed bilaterally and showed that "[d]istal latency, amplitude and velocity were normal bilaterally." (Tr. 388).  Peroneal F-wave, Tibial F-wave and Tibial H-reflex studies were performed bilaterally and showed that "latency was normal and symmetrical."  (Tr. 389).  Peroneal and tibial repetitive nerve stimulation nerve conduction studies were performed bilaterally.  (Tr. 389).  The nerve stimulation "examination was normal bilaterally without clear evidence of a decremental or incremental response identified."  (Tr. 389).  "Electromyography was performed with samples taken from the right gastrocnemlus, right tibialis anterior, and right vastus lateralis muscles.  All muscles sampled were found to be within normal limits with regard to motor unit activity."  (Tr. 389).  The impression was that "[t]his was an unremarkable electrodiagnostic exam.  There was no clear evidence of generalized peripheral neuropathy, distal entrapment neuropathy or proximal neural insult/radiculopathy."  (Tr. 389).

On January 14, 2010, X-rays of Gage's spine showed that he had a loss of normal lumbar lordosis.  (Tr. 387).  The X-ray also showed narrowing of the L5/S1 disc space, that lumbar vertebrae were in alignment, and that there were mild degenerative changes.  (Tr. 387).

13

While Gage suffers from degenerative disc disease and status post lumbar laminectomy, both of which are considered severe impairments, there is no objective medical evidence to suggest that Gage's impairments, individually or in combination, rendered him unable to engage in any type of gainful employment between August 1, 2009 and December 31, 2009.  On July 10, 2009, Dr. Daniel indicated that although Gage's gait was slow and abnormal and he had difficulties with the heel and toe examination, getting on or off the table, getting up from a sitting position and getting around the room, there was no evidence of pathological curvatures, spasm or misalignment in his back, or atrophy in his major muscle groups.  (Tr. 269).  Dr. Daniel also noted that Gage's deep tendon reflexes, sensory examination and range of motion were essentially within normal limits.  (Tr. 269).  On October 26, 2009, an MRI revealed a disc protrusion that encroached the right S1 nerve root, and that there was mild to moderate narrowing of the right neural foramen.  (Tr. 296).  However, the MRI also revealed no spinal canal stenosis and the alignment of the lumbar spine was maintained.  (Tr. 296, 395).  Nerve conduction studies performed on November 6, 2009 were normal.    (Tr. 388-89). Electromyography studies performed on November 6, 2009 were also unremarkable and there was no clear evidence of generalized peripheral neuropathy, distal entrapment neuropathy or proximal neural insult/radiculopathy.  (Tr. 389).  Thus, the objective medical evidence factor weighs in favor of the ALJ's decision that Gage was not disabled within the meaning of the Act.

C.      **Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when

14

the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore*, 919 F.2d at 905).

In his decision, the ALJ thoroughly summarized and weighed the diagnosis and expert opinions:

> As for the opinion evidence, on January 14, 2010, K. Edwards, PA-C, completed a physical residual functional capacity questionnaire concerning the claimant (Exhibit 11F, page 1). Edwards reported that he had treated the claimant since December 21, 2009. He stated that the claimant had a disc protrusion at L5-S1. Edwards stated that the claimant's pain would frequently interfere with his attention and concentration. He stated that the claimant could stand and walk for [two] hours in an [eight] hour workday. He did not state how long the claimant could sit. He stated that the claimant had to shift positions at will, and that he would need unscheduled breaks during the day. However, the claimant could occasionally lift [twenty] pounds.
>
> Although a physician assistant is not an "acceptable medical source," the [ALJ] has considered the opinion of Edwards in accordance with Social Security Ruling

06-03p. Factors for consideration of such opinions include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s), and (6) any factors that tend to support or refute the opinion (Social Security Ruling 06-03p). According to Social Security Ruling 06-03p, opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

Edwards' opinion is given little weight because it is unsupported by objective clinical findings and is inconsistent with the evidence considered as a whole. Specifically, the claimant's back condition was corrected with surgery. On February 5, 2008, Dr. George's physical examination showed that the claimant had good range of motion in the lumbosacral spine. Deep tendon reflexes were symmetrical in the lower extremities. Sensory examination was grossly intact. There was no muscle atrophy (Exhibit 13F, page 42). On June 3, 2008, Dr. Citara found that the claimant's sensation was intact to light touch throughout. His reflexes were 2+ throughout. The claimant's straight leg raising was negative (Exhibit 2F, page 28).

On July 10, 2009, Dr. Daniel found that the claimant's back had no evidence of pathological curvatures, spasm, or misalignment. The claimant had no evidence of atrophy in the major muscle groups. The claimant's reflexes, sensory examination and range of motion were all normal. The claimant was able to effectively walk on tiptoes and heels, but not able to bend over to touch toes (Exhibit 3F, page 2).

As noted, on November 6, 2009, an EMG and nerve conduction study showed that the distal latency, amplitude, and velocity were normal bilaterally. This was an unremarkable electrodiagnostic exam. There was no clear evidence of generalized peripheral neuropathy, distal entrapment neuropathy or proximal neural insult or radiculopathy (Exhibit 13F, page 4). Thus, the lack of support for Edward's opinion entitles it to little weight.

Additionally, Edwards stated that he had only treated the claimant since

16

December 21, 2009. Thus, the treatment relationship has been relatively short.

On July 21, 2009, a State Agency Medical Consultant, Teresa Fox, M.D., reviewed the claimant's medical records and completed a physical residual functional capacity assessment form concerning the claimant (Exhibit 4F, page 1). Dr. Fox reported that the claimant could lift and carry [twenty] pounds occasionally and [ten] pounds frequently, stand and walk about [six] hours in an [eight] hour day, and sit for at least [six] hours in an [eight] hour day. This opinion can only serve to add further to the conclusions reached above.

On September 8, 2009, the claimant's primary care physician at the Veteran's Administration elected not to complete a physical residual functional capacity questionnaire concerning the claimant (Exhibit 9F, page 2).

(Tr. 28-29). This summary is complete and accurate and is a fair representation of the diagnosis and expert opinions in the record.

Here, the ALJ gave greater weight to Dr. Fox's opinion because it was consistent with the other medical records considered as a whole. The ALJ gave less weight to Mr. Edwards' opinion because: (1) Mr. Edwards' opinion, as a physician assistant, was not considered an "acceptable medical source;" (2) Edwards had treated Gage since December 21, 2009, which was only a short period of time before the date last insured of December 31, 2009; and (3) Edwards' opinion was inconsistent with other evidence. Given the thoroughness of the ALJ's discussion of the objective medical evidence, and the ALJ's reliance on the opinion of Dr. Fox, which was consistent with the medical evidence as a whole, the diagnosis and expert opinions factor also supports the ALJ's decision.

## D.    Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by friends and family. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or

17

discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984.  42 U.S.C.  §  423(d)(5)(A).  The statute provides that allegations of pain do not constitute "conclusive evidence of disability."  *Id.*  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. *Id.*  Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  *Id.*  "Pain constitutes a disabling condition under the [Act] only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'"  *Selders,* 914 F.2d at 618-19 (quoting *Harrell v. Bowen,* 862 F.2d 471, 480 (5th Cir. 1988)).  In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

At the hearing before the ALJ on February 9, 2010, Gage testified regarding his condition and the resulting back pain that allegedly prevents him from working.  (Tr. 35).  Gage testified that he was injured on October 29, 2003, which led to him having back surgery on July 12, 2004. (Tr. 43).  Gage also testified he began to have pain immediately after the surgery and has been on several pain medications since.  (Tr. 44, 46).  Gage stated that he had pain just about every day and described the pain as "excruciating."  (Tr. 49).  The pain would start at his lower back and would travel down his right leg to the lower part of his calf.  (Tr. 49).  He further testified that the medication he took as a result of the pain "[made] it hard for [him] to do anything other than . . . sit[] around, stand[] around, or [lie] down" and that it was "hard for [him] to put on [his]

18

shoes." (Tr. 49). Gage testified the pain prohibited him from standing in one spot for longer than thirty minutes. (Tr. 49). Gage also testified the medicine he took made him feel high, and as a result, he would lie down twice a day for two hours on each occasion. (Tr. 50). Gage further testified that his "toes [did not] move on [his] right foot, and [he had] problems bending [his] foot down or up." (Tr. 44).

Gage indicated in his Work History Report on May 28, 2009 that he lived alone, took care of a dog, cooked his own food, and regularly drove to the store and bank. (Tr. 151-57).

Regarding Gage's subjective evidence of pain and disability, the ALJ wrote:

> The claimant testified that he was unable to work because he had injured his back while working in a chemical plant. Although he had undergone a back surgery for his injury, he stated that he had pain [two] weeks after the operation. The pain traveled down his back to his knee. The pain was excruciating. The claimant testified that his right foot toes did not move. He had difficulties moving his foot up and down.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.

> In support of this conclusion, the [ALJ] notes that the objective clinical findings do not support the claimant's alleged subjective symptoms or functional limitations. Specifically, the claimant has no neurological deficits, no serious orthopedic abnormalities, and no significant dysfunctioning of the bodily organs that would preclude a light level of exertion.

(Tr. 25). The ALJ then considered all of the objective medical evidence and concluded "there is little medical evidence to support the alleged severity of symptoms. The claimant's medical records clearly do not support a functional capacity of less than light work." (Tr. 27).

There is nothing in the record to suggest the ALJ made improper credibility findings, or

that he weighed testimony improperly.  The ALJ found discrepancies between Gage's alleged symptoms and his daily activities, and noted that the objective medical evidence did not support the alleged severity of Gage's subjective symptoms and limitations.  Accordingly, this factor also supports the ALJ's decision.

### E.    Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

The record reflects that Gage was forty-five years old on the date of the hearing.  (Tr. 39). Gage testified that he completed high school, and that he attended San Jacinto College for three months for chemical processing training.  (Tr. 39).  Gage had relevant past work experience as a valve operator.  (Tr. 42).  The ALJ concluded, after considering the entire record, that Gage had the RFC to perform a light level of work activity.  (Tr. 24).  The ALJ questioned vocational expert Thomas W. King, who testified at the hearing about Gage's ability to perform his past relevant work.  (Tr. 60).  Mr. King classified the exertional and skill levels of a refinery plant operator as light and skilled according to the Dictionary of Occupational Titles.  (Tr. 60).  The ALJ considered Mr. King's testimony in his decision:

> In comparing the claimant's [RFC] with the physical and mental demands of this work, the vocational expert testified that the claimant was able to perform it as actually and generally performed.  This testimony is credible and persuasive.
>
> Thus, based on the evidence of the record, the undersigned finds that the claimant

20

retains the [RFC] to perform his past relevant work as a valve operator.  The regulations provide that if a claimant can perform his past relevant work, he cannot be found to be disabled within the meaning of the Act (20 C.F.R. 404.1520(e)).  Consequently, the claimant cannot be found to be disabled.

(Tr. 29).  Because there is substantial evidence in the record to support the ALJ's conclusion that Gage can perform light work, this final factor also supports the ALJ's decision. [2]

## VI.    Conclusion and Order

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the SSA, which direct a finding that Gage was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. No. 10) is GRANTED, Plaintiff's Motion for Summary Judgment (Doc. No. 12) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 3rd day of July , 2012.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

---

[2] The vocational expert testified that although a refinery plant operator is considered light work as defined by the Dictionary of Occupational Titles, Gage actually performed the work at a medium to heavy exertional work level.  At step four, however, a claimant's past work can be considered either as the claimant actually performed the work, or as that work is generally performed in the national economy.  *Leggett*, 67 F.3d at 564.  Here, because a valve operator is ordinarily performed at the light exertion level, substantial evidence supports the ALJ's step four finding.